FILED:BANKRUPTCY:NJB
2026 JUN 10 AM10:10:28

# VCM CBD
# 420 Tobacco Road
# London, Kentucky 40741

<u>VIA FEDERAL EXPRESS AND EMAIL</u>

June 5, 2026

Jeanne Naughton, Clerk
US Bankruptcy Court
402 East State Street
Trenton, NJ 08608

Mr. Scott J. Freedman
457 Haddonfield Road
Suite 700
Cherry Hill, NJ 08002

RE: PureKana, LLC Bankruptcy; Case No. 24-13462; Adversary No. 26-1143

Dear Ms. Naughton and Mr. Freedman,

This letter is written in answer to recent filings and claims against VCM CBD. The purpose of this letter is to provide you with sufficient evidence to show that the exceptions delineated below are documented on our end. Most assuredly they are also documented within the physical and electronic records of PureKana, to which you have apparently unavailed yourself. Once again we categorically deny every claim you make in your letter dated May 19, 2025 addressed to VCM CBD, LLC and instead point you to the attached documents.

Sections 547(c) of the U.S. Bankruptcy Code sets out specific exceptions (defenses) to the general rule that allows a bankruptcy trustee to recover certain payments made by debtors to creditors in the 90 days before filing for bankruptcy. We assert the following defenses:

a. **Contemporaneous Exchange for New Value**. Transfers cannot be avoided if they were intended as, and in fact were a substantially contemporaneous exchange for new value given to debtor. VCM sold to PureKana newly manufactured "white label" products with CBD and other ingredients.

b. **Ordinary Course of Business**. Additionally, transfers made in the ordinary course of business or according to ordinary business terms cannot be avoided. PureKana ordered specific products, received these new products and sold these products in the normal course of business. All payments from PureKana to VCM were consideration for

1

contemporaneous products delivered to PureKana in the ordinary course of business between the parties.

In support of the foregoing defenses, VCM submits the following exhibits as attachments to this letter:

1. Exhibit 1– Doc 1, Page 13 of 13 titled: "Transfers by PureKana , LLC to VCM, LLC (January 3, 2024 to April 3, 2024)
   This list is for five payments made from PureKana to VCM for new products made to order for PureKana, delivered to PureKana, and paid or partially paid for by PureKana.
2. Exhibit 2 – VCM Ledger Sheet (Account Activity for PureKana)

   This is a VCM document showing the orders from PureKana directed to VCM for products to be manufactured, labeled and delivered to PureKana. For ease of reference, the schedule is color coded. The columns are labeled:

   i. Account Name (in blue) is PureKana
   ii. Purchase Order # is labeled PO #
   iii. Date is the date of the invoice (for debits) and payments (for credits)
   iv. Amount is the transaction amount. The actual payment amounts from PureKana are shown in red.
   v. Invoice Amount is the total amount of the invoice for the complete order including delivered marketable products and freight.
   vi. Amount Paid is the total amount paid for each of the invoices on which ordered and delivered products were received by PureKana.
   vii. Balance Due is the balance PureKana did not pay on marketable products they received from VCM pursuant to written Purchase Orders. PureKana has not paid the balances due on purchase orders VCM-0004, VCM-0005 and VCM-0006 in the total amount of $17,288.69 (Yellow on Exhibit 2)
3. Exhibit 3 – PureKana Purchase Order on PO VCM_0003. This is a PureKana document emailed to the undersigned on 11/27/23. This document corresponds with the first entry on Exhibit 2. The PO includes two pages:
   i. The email dated 11/27/23 from the PureKana authorized representative Caleb Smith.
   ii. The spreadsheet attached to the email provides the details of the specific products ordered, quantity of each product ordered and the price for each item.
4. Exhibit 4 – INVOICE. This is the VCM Invoice for PureKana purchase order VCM-0003. This is a VCM generated document. This invoice enumerates and describes the specific products, quantities and prices for each ordered products.

2

These products were delivered to PureKana. These are the products for which PureKana paid VCM in a contemporaneous exchange in the ordinary course of business. The two payments made to pay this invoice in full were $6,038.00 paid on 11/27/23 (Exhibit 2) and $7,030.63 (Exhibit 1 & 2) on 1/25/24.

5. Exhibit 5 – PureKana Purchase Order on PO VCM_0004. This is a PureKana document emailed to the undersigned on 12/22/2023. This document corresponds with the second order entry on Exhibit 2. The PO includes two pages:

   i. The email dated 12/22/2023 from the PureKana authorized representative Caleb Smith.

   ii. The spreadsheet attached to the email provides the details of the specific products ordered, quantity of each product ordered and the price for each item.

6. Exhibit 6 – INVOICE. This is the VCM Invoice for PureKana purchase order VCM-0004. This is a VCM generated document. This invoice enumerates and describes the specific products, quantities and prices for each of the ordered products. These are the products delivered to PureKana for which PureKana paid or should have paid VCM in a contemporaneous exchange. Two payments were made to pay on this invoice, which were $9,527.75 paid on 1/8/24 (Exhibit 1 & 2) and $1,482.00 paid on 1/25/24 (Exhibit 1 & 2). A remaining balance due of $9,511.77 remains outstanding (Exhibit 2)

7. Exhibit 7 – PureKana Purchase Order on PO VCM_0005. This is a PureKana document emailed to the undersigned on 1/10/24. This document corresponds with the third order entry on Exhibit 2. This PO was a contemporaneous exchange for new valuable salable products in the ordinary course of business. The PO includes two pages:

   i. The email dated 1/10/24 from the PureKana authorized representative Caleb Smith.

   ii. The spreadsheet attached to the email provides the details of the specific products ordered, quantity of each product ordered and the price for each item.

8. Exhibit 8 – INVOICE. This is the VCM Invoice for PureKana purchase order VCM-0005. This is a VCM generated document. This invoice enumerates and describes the specific products, quantities and prices for each of the ordered products. These are the products delivered to PureKana for which PureKana paid or should have paid VCM in a contemporaneous exchange in the ordinary course of business. The one payment made to pay a portion of this invoice was $4,006.00 paid on 1/15/24 (Exhibit 1 & 2). A remaining balance due of $4,527.30 remains outstanding (Exhibit 8 & 2)

3

9. Exhibit 9 – PureKana Purchase Order on PO VCM_0006. This is a PureKana document emailed to the undersigned on 1/22/24. This document corresponds with the fourth order entry on Exhibit 2. This PO was a contemporaneous exchange for new valuable salable products in the ordinary course of business. The PO includes two pages:

    i. The email dated 1/10/24 from the PureKana authorized representative Caleb Smith.

    ii. The spreadsheet attached to the email provides the details of the specific products ordered, quantity of each product ordered and the price for each item.

10. Exhibit 10 – INVOICE. This is the VCM Invoice for PureKana purchase order VCM-0006. This is a VCM generated document. This invoice enumerates and describes the specific products, quantities and prices for each of the ordered products. These are the products delivered to PureKana for which PureKana paid or should have paid VCM in a contemporaneous exchange in the ordinary course of business. The one payment made to pay a portion of this invoice was $2,649.00 paid on 2/5/24 (Exhibit 1 & 2). A remaining balance due of $3,249.62 remains outstanding (Exhibit 2 & 10).

11. Exhibit 11 – MANUFACTURING SUPPLY AGREEMENT by and between VCM, LLC and PureKana, LLC dated June 18, 2020. PureKana and VCM entered into a – MANUFACTURING SUPPLY AGREEMENT in 2020, many years prior to their 2024 demise. PureKana ordered products from VCM in the ordinary course of business according to terms enunciated in the referenced agreement. The regularity and consistency of PureKana orders and VCM fulfillment of those orders during the entire term of the MANUFACTURING SUPPLY AGREEMENT was according to the terms of the Agreement, was for arm's length transactions satisfactory to both parties and involved valuable salable products for adequate consideration.

12. Exhibit 12 is a VCM document listing a partial but representative compilation of many more PureKana purchase order details of product orders entered, merchantable products produced and delivered to PureKana and consideration paid for value received, all in the ordinary course of business. A simple reading of the CUSTOMER Amount column from the attached shows in the first entry on the first page a PureKana PO #3506 dated 7/7/2021. The value of the products produced and delivered on this PO is $20,820.80. The freight amount was $817.00. The total invoice was the total of these two amounts and was paid in full in two payments ($10,400.00 and $11,237.80). It was adequate consideration paid for valuable products received. The additional pages delineate many years of similar transactions by and between PureKana and VCM over time. Each and every transaction, except for those invoices which remain unpaid by PureKana,

4

were paid in full by PureKana in the ordinary course of business for valuable salable products received pursuant to a written definitive MANUFACTURING SUPPLY AREEMENT.

Transfers made in the ordinary course of business or according to ordinary business terms are protected from avoidance. This exhibit from the books and records of VCM shows that PureKana and VCM conducted purchase and sale transactions for salable products in the ordinary course of business since at least July 2021 through February 2024. Each of these individual transactions were for specific salable products ordered by PureKana, produced by VCM, delivered and sold to PureKana who in turn compensated VCM. This is a textbook example of "ordinary course of business and ordinary business terms".

13. Exhibit 13 is a copy of the Official Form 410, Proof of Claim filed May 9, 2024 by VCM in this case. The balance due from PureKana includes the amount unpaid on the invoices delineated above as well as the PureKana packaging on hand. The total amount due is $43,215.46.

In conclusion, it is only fair for those of us small-time operators in Tennessee who go up against the juggernaut of an unlimited budget and the Federal Court system to point out the wisdom of deceased humorist W. C. Fields: "Equity? Yes, equity; the only place you are sure to find Equity is in the dictionary under E."

Sincerely,

Will Brownlow

Manager

Cc: sfreedman@dilworthlaw.com

5

| Transfers by PureKana, LLC to VCM, LLC (January 3, 2024 to April 3, 2024) | | | | |
|---|---|---|---|---|
| 1/8/2024 | Dart Bank | x0041 | ACH | $9,527.75 |
| 1/25/2024 | Dart Bank | x0041 | ACH | $7,030.63 |
| 1/31/2024 | Dart Bank | x0041 | ACH | $4,006.00 |
| 2/5/2024 | Dart Bank | x0041 | ACH | $2,649.00 |
| 2/21/2024 | Dart Bank | x0041 | ACH | $1,482.00 |
| | | | Totals: | $24,695.38 |

Ex. 1

## VCM CBD
## ACCOUNTS RECEIVABLE - PURE KANA

| Account Name | PO # | | | Date | Amount | | | Invoice Amount | Amount Paid | Balance Due |
|---|---|---|---|---|---|---|---|---|---|---|
| PureKana | VCM-0003 | | | 11/12/2024 | $12,995.44 | | | | | |
| | | | | 11/27/2023 | $ (6,308.00) | | | | | |
| | | | | frt | $    343.19 | | | | | |
| | | | | 1/25/2024 | ▊ | $  - | | $13,338.63 | $(13,338.63) | $      - |
| | | | | | | | | | | |
| PureKana | VCM-0004 | | | 12/26/2023 | $20,039.62 | | | | | |
| | | | | 1/8/2024 | ▊ | | | | | |
| | | | | frt | $    481.90 | | | | | |
| | | | | 2/21/2024 | ▊ | | | $20,521.52 | $(11,009.75) | $ 9,511.77 |
| | | | | | | | | | | |
| PureKana | VCM-0005 | | | | $ 8,229.36 | | | | | |
| | | | | 1/15/2024 | ▊ | | | | | |
| | | | | frt | $    303.94 | | | | | |
| | | | | | | | | $ 8,533.30 | $ (4,006.00) | $ 4,527.30 |
| | | | | | | | | | | |
| PureKana | VCM-0006 | | | 1/22/2024 | $ 5,827.80 | | | | | |
| | | | | 2/5/2024 | ▊ | | | | | |
| | | | | frt | $     70.82 | | | | | |
| | | | | | | | | $ 5,898.62 | $ (2,649.00) | $ 3,249.62 |

| | | Invoice Amount | Amount Paid | Balance Due |
|---|---|---|---|---|
| | | $48,292.07 | $(31,003.38) | $17,288.69 |

▊

**Balances Due**

*EX 2*

PK outstanding payments - legal 3-30-26

 Outlook

---

New PO - VCM-0003

From Caleb Smith <caleb@purekana.com>
Date Mon 11/27/2023 8:28 AM
To   Tod Shuttleworth <tod@vcmcbd.com>; Will Brownlow <will@vcmcbd.com>

 1 attachment (68 KB)
VCM-0003 - Updated (1).xlsx

Hi Tod and Will,

Hope you had a good Thanksgiving and relaxing weekend!

I have a PO attached - finance will schedule the deposit today. Also, are we still on track to have the remaining items from the previous PO shipped out today, and if so can we have those overnighted as well?

Thank you, and talk to you this afternoon,

--

Caleb Smith

Manager of Operations

Simply Better Brands Corp (TSXV: SBBC)

cell: 615-975-5869

email: caleb@purekana.com



EX 3

# INVOICE

**VCM LLC**
420 TOBACCO ROAD
London, KY 40741

will@vcmcbd.com
+1 (606) 878-9000
www.vcmcbd.com

**Bill to**
Brian Meadows
PureKana
6710 N Scottsdale Rd
Suite 240
Scottsdale, AZ 85253

**Ship to**
Brian Meadows
PureKana
PureKana
Brian Meadows
6710 N Scottsdale Rd
Suite 240
Scottsdale, AZ 85253

**Invoice details**
Invoice no.: VCM-0003
Terms: 50% Due in Advance
Invoice date: 11/23/2023
Due date: 12/07/2023

| # | Date | Product or service | SKU | Description | Qty | Rate | Amount |
|---|------|-------------------|-----|-------------|-----|------|--------|
| 1. | | **300 mg Mint** | 11 | Full Spectrum 300 mg Mint 30 ml | 420 | $6.96 | $2,923.20 |
| 2. | | **1000 mg Natural/Unflavored** | 30 | Full Spectrum 1000 mg Natural 30 ml | 221 | $11.44 | $2,528.24 |
| 3. | | **Softgels PM** | 3-PM | Full Spectrum PM | 300 | $9.88 | $2,964.00 |
| 4. | | **Keep Calm Gummy** | 4-CLM | BSD Gummy | 500 | $9.16 | $4,580.00 |
| 5. | | **Freight** | | Freight | 1 | $343.19 | $343.19 |

| | |
|---|---|
| **Total** | **$13,338.63** |
| Payment | -$13,338.63 |
| **Balance due** | **$0.00** |

EX 4

**Paid in Full**

3/30/26, 1:39 PM

🔷 Outlook

---

VCM-0004 - New PO

From Caleb Smith <caleb@purekana.com>
Date Fri 12/22/2023 12:38 PM
To   Will Brownlow <will@vcmcbd.com>; Tod Shuttleworth <tod@vcmcbd.com>

📎 1 attachment (66 KB)
VCM-0004 (3).xlsx;

Hi Will and Tod,

Wanted to go ahead and get this in before the weekend and Holidays - Have another PO for you.

Thank you so much, and have a Merry Christmas!

--

Caleb Smith

Manager of Operations

Simply Better Brands Corp (TSXV: SBBC)

cell: 615-975-5869

email: caleb@purekana.com

 EX 5



| SKU | Description | QTY | Cost | Total | | Address | Bill To: | Ship To: | Date | Invoice# | PO# | Terms |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | Mint 600mg Tincture | 350 | $6.85 | $2,397.50 | | Purekana | | Source 4 | 10/3/2023 | | | VCM-000250% upfront, 50% on shipment |
| 22 | Vanilla 600mg Tincture | 300 | $6.85 | $2,055.00 | | 6710 N Scottsdale RD | | 100 Lackawanna Ave | | | | |
| 20 | Natural 600mg Tincture | 300 | $6.85 | $2,055.00 | | Scottsdale, AZ, 85253 | | Parsippany NJ 07054 | | | | |
| 60-SLP | Sleep 1500mg Tincture | 300 | $14.61 | $4,383.00 | | | | | | | | |
| 30 | Natural 1000mg Tincture | 200 | $11.44 | $2,288.00 | | | | | | | | |
| 32 | Vanilla 1000mg Tincture | 300 | $11.44 | $3,432.00 | | | | | | | | |
| | | | Grand Total | $16,610.50 | | | | | | | | |

# INVOICE

**VCM LLC**
420 TOBACCO ROAD
London, KY 40741

will@vcmcbd.com
+1 (606) 878-9000
www.vcmcbd.com

**Bill to**
Brian Meadows
PureKana
6710 N Scottsdale Rd
Suite 240
Scottsdale, AZ 85253

**Ship to**
Brian Meadows
PureKana
PureKana
Brian Meadows
6710 N Scottsdale Rd
Suite 240
Scottsdale, AZ 85253

**Invoice details**
Invoice no.: VCM-0004
Terms: 50% Due in Advance
Invoice date: 12/26/2023
Due date: 01/05/2024

| # | Date | Product or service | SKU | Description | Qty | Rate | Amount |
|---|------|--------------------|-----|-------------|-----|------|--------|
| 1. | | **600 mg Mint** | | Full Spectrum Mint 600 mg 30 ml | 364 | $8.83 | $3,214.12 |
| 2. | | **600 mg Vanilla** | 22 | Full Spectrum Vanilla 600 mg 30 ml | 315 | $8.83 | $2,781.45 |
| 3. | | **1000 mg Vanilla** | 32 | Full Spectrum 1000 mg Vanilla 30 ml | 313 | $11.44 | $3,580.72 |
| 4. | | **600 mg Natural/Unflavored** | 20 | Full Spectrum 600 mg Natural/Unflavored 30 ml | 315 | $8.83 | $2,781.45 |
| 5. | | **1000 mg Natural/Unflavored** | 30 | Full Spectrum 1000 mg Natural 30 ml | 216 | $11.44 | $2,471.04 |
| 6. | | **Sleep Tincture** | | Full Spectrum - 1500 mg | 316 | $16.49 | $5,210.84 |
| 7. | | **Freight** | | Freight | 1 | $481.90 | $481.90 |

Ex 6

| | |
|---|---|
| **Total** | **$20,521.52** |
| Payment | -$9,527.75 |

**Outlook**

## VCM-0005 - New PO

**From** Caleb Smith <caleb@purekana.com>

**Date** Wed 1/10/2024 12:57 PM

**To**    Tod Shuttleworth <tod@vcmcbd.com>; Will Brownlow <will@vcmcbd.com>

📎 1 attachment (66 KB)

VCM-0005 (Updated).xlsx;

Hi Will and Tod,

I have a new PO. I'm working on an official DQ list as well based on conversions with finance and sales, I will try to have that completely ready by our call next week.

Thank you,

--

**Caleb Smith**

Manager of Operations

Simply Better Brands Corp (TSXV: SBBC)

cell: 615-975-5869

email: caleb@purekana.com

EX 7

| SKU | Description | QTY | Cost | Total |
|---|---|---|---|---|
| 32 | 1000mg Vanilla Oil | 300 | $11.44 | $3,432.00 |
| 4-CLM | Calm Gummies | 500 | $9.16 | $4,580.00 |
| | | | Grand Total | $8,012.00 |

| Address | Bill To: | Ship To: | Date | Invoice# | PO# | Terms |
|---|---|---|---|---|---|---|
| Purekana | | Source 4 | 1/9/2024 | | VCM-0005 | 50% upfront, 50% on shipment |
| 6710 N Scottsdale RD | | 100 Lackawanna Ave | | | | |
| Scottsdale, AZ, 85253 | | Parsippany NJ 07054 | | | | |

# INVOICE

**VCM LLC**
420 TOBACCO ROAD
London, KY 40741

will@vcmcbd.com
+1 (606) 878-9000
www.vcmcbd.com

**Bill to**
Brian Meadows
PureKana
6710 N Scottsdale Rd
Suite 240
Scottsdale, AZ 85253

**Ship to**
Brian Meadows
PureKana
PureKana
Brian Meadows
6710 N Scottsdale Rd
Suite 240
Scottsdale, AZ 85253

**Invoice details**
Invoice no.: VCM-0005
Terms: 50% Due in Advance
Invoice date: 01/10/2024
Due date: 01/20/2024

| # | Date | Product or service | SKU | Description | Qty | Rate | Amount |
|---|------|--------------------|-----|-------------|-----|------|--------|
| 1. | | **1000 mg Vanilla** | 32 | Full Spectrum 1000 mg Vanilla 30 ml | 319 | $11.44 | $3,649.36 |
| 2. | | **Keep Calm Gummy** | 4-CLM | BSD Gummy | 500 | $9.16 | $4,580.00 |
| 3. | | **Freight** | | Freight | 1 | $303.94 | $303.94 |

| | |
|---|---|
| **Total** | **$8,533.30** |
| Payment | -$4,006.00 |
| **Balance due** | **$4,527.30** |
| **Overdue** | 01/20/2024 |

 EX 8

 **Outlook**

---

### New PO - VCM-0006

---

**From** Caleb Smith <caleb@purekana.com>

**Date** Mon 1/22/2024 11:00 AM

**To**    Tod Shuttleworth <tod@vcmcbd.com>; Will Brownlow <will@vcmcbd.com>

📎 1 attachment (66 KB)

VCM-0006 .xlsx;

Hi Tod and Will,

I have a PO, attached below.

Thank you,

--

**Caleb Smith**

Manager of Operations

Simply Better Brands Corp (TSXV: SBBC)

cell: 615-975-5869

email: caleb@purekana.com

 EX 9

| SKU | Description | QTY | Cost | Total | Address | Bill To: | Ship To: | Date | Invoice# | PO# | Terms |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | VCM-0006 | 50% upfront, 50% on shipment |
| 21 | 600mg Mint Oil | 200 | $8.83 | $1,766.00 | Purekona | | Source 4 | | | | |
| 22 | 600mg Vanilla Oil | 200 | $8.83 | $1,766.00 | 6710 N Scottsdale RD | | 100 Lackawanna Ave | | | | |
| 20 | 600mg Natural Oil | 200 | $8.83 | $1,766.00 | Scottsdale, AZ, 85253 | | Parsippany NJ 07054 | | | | |

# INVOICE

**VCM LLC**
420 TOBACCO ROAD
London, KY 40741

will@vcmcbd.com
+1 (606) 878-9000
www.vcmcbd.com

**Bill to**
Brian Meadows
PureKana
6710 N Scottsdale Rd
Suite 240
Scottsdale, AZ 85253

**Ship to**
Brian Meadows
PureKana
PureKana
Brian Meadows
6710 N Scottsdale Rd
Suite 240
Scottsdale, AZ 85253

**Invoice details**
Invoice no.: VCM-0006
Terms: 50% Due In Advance
Invoice date: 01/22/2024
Due date: 01/31/2024

| # | Date | Product or service | SKU | Description | Qty | Rate | Amount |
|---|------|--------------------|-----|-------------|-----|------|--------|
| 1. | | **600 mg Mint** | | Full Spectrum Mint 600 mg 30 ml | 219 | $8.83 | $1,933.77 |
| 2. | | **600 mg Vanilla** | 22 | Full Spectrum Vanilla 600 mg 30 ml | 221 | $8.83 | $1,951.43 |
| 3. | | **600 mg Natural/Unflavored** | 20 | Full Spectrum 600 mg Natural/Unflavored 30 ml | 220 | $8.83 | $1,942.60 |
| 4. | | **Freight** | | Freight | 1 | $70.82 | $70.82 |

**Total** $5,898.62

Payment -$2,649.00

**Balance due** $3,249.62

**Overdue** 01/31/2024



## MANUFACTURING SUPPLY AGREEMENT

This Manufacturing Supply Agreement, dated as of [June 18], 2020 (the *"Agreement"*), is entered into by and between **VCM, LLC**, a Tennessee limited liability company having its principal place of business at 178 Clifftop Drive, Hendersonville, TN 37075 (*"Seller"*), and PureKana, LLC, a Delaware limited liability company, having its principal place of business at 6710 N. Scottsdale Rd., Suite 240, Scottsdale, AZ 85253 (*"Buyer"*).

(*"Buyer"*, and together with Seller, the *"Parties"*, and each, a *"Party"*).

**WHEREAS**, Seller is in the business of manufacturing and selling extracts from Industrial Hemp containing cannabinoids;

**WHEREAS**, Buyer wishes to purchase certain Goods (as defined below) from Seller; and

**WHEREAS**, Seller is an authorized manufacturer's representative of Viobin, LLC who desires to manufacture and sell the Goods to Buyer.

**NOW, THEREFORE**, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Definitions. Capitalized terms have the meanings set out or referred to in this Section 1.

*"Act"* means the Industrial Hemp Regulatory Program Act, Title 35, Article 61, C.R.S.

*"Action"* means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or other, whether at law, in equity or otherwise.

*"Affiliate"* of a Person means any other Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person.

*"Agreement"* has the meaning set forth in the preamble to this Agreement.

*"Basic Purchase Order Terms"* means, collectively, any one or more of the following terms specified by Buyer in a Purchase Order pursuant to Section 3.2: (a) a list of the Goods to be purchased, including their SKU/SKU Description; (b) the quantity of each of the Goods ordered; (c) the Requested Delivery Date; (d) the billing address; and (e) the Delivery Location. For the avoidance of doubt, the term "Basic Purchase Order Terms" does not include any general terms or conditions of any Purchase Order.

*"Business Day"* means any day except Saturday, Sunday or any other day on which commercial banks located in Nashville, Tennessee are authorized or required by Law to be closed for business.

*"Buyer"* has the meaning set forth in the preamble to this Agreement.

*"Buyer Labeling and Packaging"* means any of Buyer's proprietary packaging or labeling materials to be applied to Goods as specified on **Exhibit A**.

EX
\\

DocID: 4838-7912-3630.1

"*Claim*" means any Action brought against a Person entitled to indemnification under Section 10.

"*Confidential Information*" has the meaning set forth in Section 13.1.

"*Control*" (and with correlative meanings, the terms "Controlled by" and "under common Control with") means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of another Person, whether through the ownership or voting securities, by contract, or otherwise.

"*Delivery Location*" means either Seller's Facility or Buyer's warehouse as designated in the Purchase Order.

"*Disclosing Party*" has the meaning set forth in Section 13.1.

"*Dispute*" has the meaning set forth in Section 15.16.

"*Dispute Notice*" has the meaning set forth in Section 15.16.

"*Effective Date*" means the date first set forth above.

"*Force Majeure Event*" has the meaning set forth in Section 15.20.

"*Forecast*" means, with respect to any period, a good faith projection or estimate of Buyer's requirements for Goods during each month during the period, which approximates, as nearly as possible, based on information available at the time to Buyer, the quantity of Goods that Buyer may order for each such month.

"*Good(s)*" means the goods identified on **Schedule 1** and described in the Specifications.

"*Governmental Authority*" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"*Governmental Order*" means any order, writ, judgment, injunction, decree, stipulation, award or determination entered by or with any Governmental Authority.

"*IDA*" means the State of Illinois Department of Agriculture.

"*Indemnified Party*" means, as applicable, the Seller Indemnified Party or Buyer Indemnified Party as such terms are defined in Sections 10.1 and 10.2.

"*Indemnifying Party*" means, as applicable, the Seller Indemnifying Party or Buyer Indemnifying Party as such terms are defined in Sections 10.1 and 10.2.

"*Industrial Hemp*" has the meaning provided in the Act.

2

"*Industrial Hemp Laws*" means the Act and the rules and regulations promulgated thereunder by the IDA, USDA, and all other federal, state and local rules, regulations, and ordinances applicable to the Company, as the same may be amended from time to time.

"*Initial Term*" has the meaning set forth in Section 6.1.

"*Inspection Period*" has the meaning set forth in Section 4.4.

"*Intellectual Property Rights*" means all industrial and other intellectual property rights comprising or relating to: (a) Patents; (b) Trademarks; (c) internet domain names, whether or not Trademarks, registered by any authorized private registrar or Governmental Authority, web addresses, web pages, website and URLs; (d) works of authorship, expressions, designs and design registrations, whether or not copyrightable, including copyrights and copyrightable works, software, data, data files, and databases and other specifications and documentation; (e) Trade Secrets; and (f) all industrial and other intellectual property rights, and all rights, interests and protections that are associated with, equivalent or similar to, or required for the exercise of, any of the foregoing, however arising, in each case whether registered or unregistered and including all registrations and applications for, and renewals or extensions of, such rights or forms of protection pursuant to the Laws of any jurisdiction throughout in any part of the world.

"*Law*" means any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, Industrial Hemp Law, Governmental Order or other requirement or rule of law of any Governmental Authority.

"*Losses*" has the meaning set forth in Section 10.1.

"*Lot*" means a sale of Goods by Seller to Buyer specified in a Purchase Order.

"*Nonconforming Goods*" means any goods received by Buyer from Seller pursuant to a Purchase Order that: (a) do not conform to the SKU/SKU Descriptions; listed in the applicable Purchase Order; (b) do not conform to the Specifications and such nonconformance is material; or (c) materially exceed the quantity of Goods ordered by Buyer pursuant to this Agreement or any Purchase Order. Where the context requires, Nonconforming Goods are deemed to be Goods for purposes of this Agreement.

"*Notice*" has the meaning set forth in Section 15.5.

"*Party*" has the meaning set forth in the preamble to this Agreement.

"*Patents*" means all patents (including all reissues, divisionals, provisionals, continuations and continuations-in-part, re-examinations, renewals, substitutions and extensions thereof), patent applications, and other patent rights and any other Governmental Authority-issued indicia of invention ownership (including inventor's certificates, petty patents and patent utility models).

"*Payment Failure*" has the meaning set forth in Section 6.2.

"*Person*" means any individual, partnership, corporation, trust, limited liability entity, unincorporated organization, association, Governmental Authority or any other entity.

3

"*Personnel*" of a Party means any agents, employees, contractors or subcontractors engaged or appointed by such Party.

"*Price*" has the meaning set forth in Section 5.1.

"*Purchase Order*" means Buyer's purchase order issued to Seller hereunder, including all terms and conditions attached to, or incorporated into, such purchase order.

"*Receiving Party*" has the meaning set forth in Section 13.1.

"*Renewal Term*" has the meaning set forth in Section 6.1.

"*Representatives*" means a Party's Affiliates and each of their respective Personnel, officers, directors, partners, shareholders, attorneys, third-party advisors, successors and permitted assigns.

"*Requested Delivery Date*" means the date requested for Seller to deliver the Goods specified in a Purchase Order, provided that such date may not be less than the Lead Time provided for the applicable Goods on **Schedule 1**.

"*Seller*" has the meaning set forth in the preamble to this Agreement.

"*Seller's Facility*" mean the Seller's manufacturing plant located at 226 W Livingston St, Monticello, IL 61856.

"*Seller Tooling*" has the meaning set forth in Section 14.

"*Seller's Intellectual Property Rights*" means all Intellectual Property Rights owned by or licensed to Seller.

"*Seller's Trademarks*" means all Trademarks owned by or licensed to Seller.

"*Specifications*" means the specifications for the Goods attached hereto as **Exhibit[s] A[ through [LETTER]]**. (These exhibits will be added once all parties agree to final formulations.)

"*Taxes*" means any and all present and future sales, income, stamp and other taxes, levies, imposts, duties, deductions, charges, fees or withholdings imposed, levied, withheld or assessed by any Governmental Authority, together with any interest or penalties imposed thereon.

"*Term*" has the meaning set forth in Section 6.1.

"*Tooling*" means, collectively, all tooling, dies, test and assembly fixtures, gauges, jigs, patterns, casting patterns, cavities, molds, and documentation (including engineering specifications and test reports) used by Seller in connection with its manufacture and sale of the Goods, together with any accessions, attachments, parts, accessories, substitutions, replacements and appurtenances thereto.

"*Trade Secrets*" means all inventions, discoveries, trade secrets, business and technical information and know-how, databases, data collections, patent disclosures and other confidential and proprietary information and all rights therein.

"*Trademarks*" means all rights in and to US and foreign trademarks, service marks, trade dress, trade names, brand names, logos, corporate names and domain names and other similar

4

designations of source, sponsorship, association or origin, together with the goodwill symbolized by any of the foregoing, in each case whether registered or unregistered and including all registrations and applications for, and renewals or extensions of, such rights and all similar or equivalent rights or forms of protection in any part of the world.

"*USDA*" means the United States Department of Agriculture.

2.   Purchase and Sale of Goods.

   2.1   Purchase and Sale.

      (a)   Subject to the terms and conditions of this Agreement, during the Term, Buyer shall purchase from Seller, and Seller shall manufacture and sell to Buyer, Buyer's requirements of the Goods described on **Schedule 1**. The Parties shall, from time to time, amend **Schedule 1** to reflect any agreed revisions to any of the terms described thereon; provided that no such revisions will modify this Agreement or be binding on the Parties unless such revisions have been fully approved in a signed writing by authorized Representatives of both Parties.

      (b)   Buyer agrees to purchase not less than the SKU Minimum Order Quantity set forth in **Schedule 1** for any Good pursuant to any single Purchase Order.

   2.2   Terms of Agreement Prevail Over Buyer's Purchase Order. The Parties intend for the express terms and conditions contained in this Agreement (including any Schedules and Exhibits hereto) and the Basic Purchase Order Terms contained in the applicable Purchase Order to exclusively govern and control each of the Parties' respective rights and obligations regarding the subject matter of this Agreement, and this Agreement is expressly limited to such terms and conditions. Without limitation of the foregoing, any additional, contrary or different terms contained in any Purchase Order or other request or communication by Buyer pertaining to the sale of Goods by Seller, and any attempt to modify, supersede, supplement or otherwise alter this Agreement, will not modify this Agreement or be binding on the Parties unless such terms have been fully approved in a signed writing by authorized Representatives of both Parties.

   2.3   Right to Manufacture and Sell Competitive Goods. This Agreement does not limit Seller's right to manufacture or sell, or preclude Seller from manufacturing or selling, to any Person, or entering into any agreement with any other Person related to the manufacture or sale of, the Goods and other goods or products that are similar to or competitive with the Goods.

   2.4   Additional Obligations of Seller.

      (a)   Seller shall only use Buyer's proprietary formulations for Goods as specified on **Schedule 1** and in the Specifications.

      (b)   Seller shall provide Buyer with prior notice of any change to the formulation of any Good and Buyer shall not have any obligation to purchase such Goods without Buyer's approval of such formulation change. Any change in formulation much be agreed to in writing by all Parties.

      (c)   Seller will keep a retention sample (a sample of a fully packaged unit from each manufacturing batch of finished Goods) for a period of six months after manufacture.

5

(d)      Seller will provide a third-party Certificate of Analysis for cannabinoid potency for the Goods. Any additional third-party tests requested by Buyer shall be at Buyer's expense.

3.    Ordering Procedure.

3.1      Non-binding Forecasts of Buyer's Requirements. Within 30 days following the full execution of this Agreement, Buyer shall provide to Seller a twelve-month Forecast. On a quarterly basis, Buyer shall endeavor to provide Seller with updated Forecasts. Forecasts are for informational purposes only and do not create any binding obligations on behalf of either Party; provided, however, that Seller shall not be required to manufacture and sell to Buyer any quantity of Goods that is unreasonably disproportionate to any Forecast for the period covered by such Forecast.

3.2      Purchase Orders. Buyer shall issue to Seller Purchase Orders (containing applicable Basic Purchase Order Terms that are consistent with the terms of this Agreement), in written form via facsimile, e-mail or US mail. By issuing a Purchase Order to Seller, Buyer makes an offer to purchase Goods pursuant to the terms and conditions of this Agreement and the Basic Purchase Order Terms contained in such Purchase Order, and on no other terms. For the avoidance of doubt, any variations made to the terms and conditions of this Agreement by Buyer in any Purchase Order are void and have no effect. Buyer shall be obligated to purchase from Seller quantities of Goods specified in a Purchase Order which are conforming with the respective Specifications.

3.3      Acceptance, Rejection and Cancellation of Purchase Orders. Seller accepts a Purchase Order by confirming the order in writing or by delivering the applicable Goods to Buyer, whichever occurs first. Seller may reject a Purchase Order or cancel a previously accepted Purchase Order, which it may do without liability or penalty, and without constituting a waiver of any of Seller's rights or remedies under this Agreement or any Purchase Order, by providing written notice to Buyer specifying the applicable date of rejection or cancellation:

(a)      if any one or more of the events described under Sections 6.2(a)-(b) has occurred;

(b)      pursuant to Seller's rights under Section 5.4(b) or Section 5.4(c); or

(c)      pursuant to Seller's rights under the last sentence of Section 5.5.

4.    Acceptance and Inspection.

4.1      Delivery. Unless otherwise expressly agreed by the Parties in writing, Seller shall deliver the Goods to Buyer at the Delivery Location specified in the Purchase Order. If no Delivery Location is specified in the Purchase Order, the Delivery Location shall be deemed to be Seller's Facility. The Delivery Location may only be Seller's Facility or Buyer's distribution warehouse. Seller will not deliver Goods directly to Buyer's customers. If Goods have been delivered to Seller's Facility and have not picked-up by Buyer after 120 days, then Seller shall have the right to dispose of such Goods without compensation to Buyer. Seller shall have the right to suspend production or delivery of Goods for any period in which Buyer is late on a payment obligation to Seller. No delay in the pick-up or delivery of any Good relieves Buyer of its obligations under this Agreement, including accepting delivery of any remaining installment or other orders of Goods.

4.2      Late Delivery. Any time quoted for delivery is an estimate only; provided, however, that Seller shall use commercially reasonable efforts to have all Goods available on or before the Requested Delivery Date. If Seller has delayed the pick-up of all or any Goods for more than 14 days

after the Requested Delivery Date and if such delay is not due to any action or inaction of Buyer or otherwise excused in accordance with the terms and conditions of this Agreement, Buyer may, as its sole remedy therefor, cancel the portion of the related Purchase Order covering the delayed Goods by giving Seller written Notice within 100 days after the Requested Delivery Date.

4.3     Transfer of Title and Risk of Loss.

(a)     Title to Goods picked-up under any Purchase Order passes to Buyer upon receipt by Buyer and full payment of the Price for such Goods by Buyer.

(b)     To the extent applicable, risk of loss to Goods shipped under any Purchase Order passes to Buyer upon Seller's tender of such Goods at the Delivery Location.

4.4     Inspection. Buyer shall inspect Goods received under this Agreement within ten (10) days of receipt of such Goods ("*Inspection Period*") and either accept or, only if any such Goods are Nonconforming Goods, reject such Goods. Buyer will be deemed to have accepted Goods unless it provides Seller with written Notice of any Nonconforming Goods within ten (10) days following the Inspection Period, stating with specificity all defects and nonconformities, and furnishing such other written evidence or other documentation as may be reasonably required by Seller (including the subject Goods, or a representative sample thereof, which Buyer contends are Nonconforming Goods). All defects and nonconformities that are not so specified will be deemed waived by Buyer, such Goods shall be deemed to have been accepted by Buyer, and no attempted revocation of acceptance will be effective. If Buyer timely notifies Seller of any Nonconforming Goods, Seller shall determine, in its reasonable discretion, whether the Goods are Nonconforming Goods. If Seller determines that such Goods are Nonconforming Goods, Seller shall, in its sole discretion, either:

(a)     replace such Nonconforming Goods with conforming Goods; or

(b)     refund to Buyer such amount paid by Buyer to Seller for such Nonconforming Goods returned by Buyer to Seller.

If Seller exercises its option to replace Nonconforming Goods, Buyer shall pick-up all replacement Goods at Seller's Facility or such other location as mutually agreed by the Parties.

THE REMEDIES SET FORTH IN THIS SECTION 4.4 ARE BUYER'S EXCLUSIVE REMEDY FOR THE DELIVERY OF NONCONFORMING GOODS.

4.5     Limited Right of Return. Except as provided under Section 4.4, and Section 9.4, Buyer has no right to return Goods after Buyer has delivered such Goods pursuant to this Agreement.

5.     Price and Payment.

5.1     Price. Buyer shall purchase the Goods from Seller at the per unit sale prices set forth on **Schedule 1** attached hereto, *plus* Seller's cost of shipping Goods to the Delivery Location if other than Seller's Facility (together, the "*Price*").

5.2     Shipping Charges, Insurance and Taxes. If applicable, Buyer shall pay for, and shall hold Seller harmless from, all shipping charges and insurance costs. In addition, all Prices are exclusive of, and Buyer is solely responsible for, and shall pay, and shall hold Seller harmless from, all Taxes, with respect to, or measured by, the manufacture, sale, shipment, use or Price of the Goods (including interest and penalties thereon).

7

5.3 <u>Payment Terms</u>. Buyer shall pay 50% the Price for the Lot upon Seller's acceptance of the Purchase Order and pay the remaining 50% after the Inspection Period (outlined in Section 4.4). Buyer shall make all payments in US dollars by wire transfer, in accordance with Seller's wire instructions provided from time to time. Amounts due to Seller hereunder that are not included in Price for the Goods will be invoiced to Buyer in accordance with Seller's regular invoicing schedule and due net 30 days from invoice.

5.4 <u>Buyer's Unsatisfactory Credit Status</u>. Each issuance of a Purchase Order to Seller will constitute Buyer's representation and warranty that Buyer is solvent and is able to pay for the Goods identified in such Purchase Order in accordance with the terms of this Agreement. Throughout the Term, Buyer shall be in compliance with all obligations to Buyer's creditors as and when such obligations are due and owing in the ordinary course of Buyer's business. Buyer shall notify Seller, in writing, immediately of any and all events that have had or may have a material adverse effect on Buyer's business or financial condition, including any change in management, sale, lease or exchange of a material portion of Buyer's assets, a change in Control of Buyer, or the breach of any loan covenants or other material obligations of Buyer to its creditors. If, at any time, Seller determines in its reasonable sole discretion that Buyer's financial condition or creditworthiness is inadequate or unsatisfactory, then in addition to Seller's other rights under this Agreement, at law or in equity, Seller may without liability or penalty, take one or more of the following actions:

(a) On three day's prior written Notice, modify the payment terms specified in Section 5.3 for outstanding and future purchases, including requiring Buyer to pay for Goods on a cash in advance basis;

(b) reject any Purchase Orders received from Buyer;

(c) cancel any previously accepted Purchase Orders;

(d) delay or withhold any further shipment of Goods to Buyer;

(e) stop delivery of any Goods in transit and cause such Goods in transit to be returned to Seller;

(f) on sixty days' prior written Notice, terminate this Agreement;

(g) accelerate the due date of all amounts owing by Buyer to Seller.

No action taken by Seller under this Section 5.4 (nor any failure of Seller to act under this Section 5.4) constitutes a waiver by Seller of any of its rights and remedies under this Agreement, including its right to enforce Buyer's obligation to make payments as required hereunder.

5.5 <u>Late Payments</u>. Except for invoiced payments that Buyer has successfully disputed, Buyer shall pay interest on all late payments (whether during the Term or after the expiration or earlier termination of the Term), calculated daily and compounded monthly, at the lesser of the rate of 1.8% per month or the highest rate permissible under applicable Law. Buyer shall also reimburse Seller for all costs incurred by Seller in collecting any late payments, including attorneys' fees and court costs. In addition to all other remedies available under this Agreement or at Law (which Seller does not waive by the exercise of any rights under this Agreement), if Buyer fails to pay any undisputed amounts when due under this Agreement, Seller may (a) suspend the delivery of any Goods, (b) reject Buyer's Purchase Orders or cancel accepted Purchase Orders pursuant to the terms of Section 3.3 or (c) terminate this Agreement pursuant to the terms of Section 6.2.

8

5.6     No Set-off Right. Buyer shall not, and acknowledges that it will have no right, under this Agreement, any Purchase Order, any other agreement, document or Law to, withhold, offset, recoup or debit any amounts owed (or to become due and owing) to Seller or any of its Affiliates, whether under this Agreement or otherwise, against any other amount owed (or to become due and owing) to it by Seller or Seller's Affiliates, whether relating to Seller's or its Affiliates' breach or non-performance of this Agreement, any Purchase Order, any other agreement between (a) Buyer or any of its Affiliates and (b) Seller or any of its Affiliates, or otherwise.

6.     Term; Termination.

6.1     Term. The term of this Agreement commences on the Effective Date and continues through June 30, 2022 (the *"Initial Term"*), at which time it shall be automatically renewed hereafter for additional periods of successive one (1) year terms, unless either party delivers written notice to the other party, not less than ninety (90) days prior to the expiration of the then current term, of its desire to terminate the Agreement at the end of the current term (each additional term, if any, a *"Renewal Term"*, and together with the Initial Term, the *"Term"*).

6.2     Right to Terminate.

(a)     Seller may terminate this Agreement, by providing written Notice to Buyer:

(i)     if Buyer fails to pay any amount when due under this Agreement (*"Payment Failure"*);

(ii)     pursuant to and in accordance with Section 5.4(f); or

(iii)     if Seller terminates any other agreement between (i) Seller and (ii) Buyer or Buyer's Affiliates, due to Buyer's or Buyer's Affiliates' breach or non-performance thereof.

(b)     Either Party may terminate this Agreement, by providing written Notice to the other Party:

(i)     Upon a Party's breach of any representation, warranty or covenant under this Agreement (other than committing a Payment Failure as addressed above), and either the breach cannot be cured or, if the breach can be cured, it is not cured within 30 days of written Notice of such breach; or

(ii)     if a Party (i) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due, (ii) files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency Law, (iii) makes or seeks to make a general assignment for the benefit of its creditors, or (iv) applies for or has appointed a receiver, trustee, custodian or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

Any termination under this Section 6.2 will be effective on the receipt of written Notice of termination (allowing for any applicable cure period) or such later date (if any) set forth in such Notice.

9

6.3     Effect of Expiration or Termination.

(a)     Upon the expiration or earlier termination of this Agreement, all indebtedness of Buyer to Seller under this Agreement, any other agreement or otherwise, of any kind, shall become immediately due and payable to Seller, without further notice to Buyer.

(b)     Expiration or termination of the Term will not affect any rights or obligations of the Parties that:

(i)     come into effect upon or after termination or expiration of this Agreement; or

(ii)     otherwise survive the expiration or earlier termination of this Agreement pursuant to Section 15.4 and were incurred by the Parties prior to such expiration or earlier termination.

(c)     Any Notice of termination under this Agreement automatically operates as a cancellation of any deliveries of Goods to Buyer that are scheduled to be made subsequent to the effective date of termination, whether or not any orders for such Goods had been accepted by Seller. With respect to any Goods that are still in transit upon termination of this Agreement, Seller may require, in its sole discretion, that all sales and deliveries of such Goods be made on either a cash-only or certified-check basis.

(d)     Upon the expiration or termination of this Agreement, both Parties shall:

(i)     return to the other Party all documents and tangible materials (and any copies) containing, reflecting, incorporating or based on the other Party's Confidential Information;

(ii)     permanently erase all of the other Party's Confidential Information from its computer systems, except for copies that are maintained as archive copies on its disaster recovery and/or information technology backup systems. The Parties shall both destroy any such copies upon the normal expiration of its backup files; and

(iii)     certify in writing to the other Party that it has complied with the requirements of this clause.

(e)     The Party terminating this Agreement, or in the case of the expiration of this Agreement, each Party, shall not be liable to the other Party for any damage of any kind (whether direct or indirect) incurred by the other Party by reason of the expiration or earlier termination of this Agreement. Termination of this Agreement will not constitute a waiver of any of either Party's rights, remedies or defenses under this Agreement, at law, in equity or otherwise.

7.     Certain Obligations of Buyer.

7.1     Certain Prohibited Acts. Notwithstanding anything to the contrary in this Agreement, neither Buyer nor any Buyer Personnel shall market or sell any of the Goods in violation of applicable law, including the rules and regulations regarding industrial hemp products promulgated by the U.S. Food and Drug Administration.

10

7.2    Credit Risk on Resale of the Goods to Customers. Buyer shall be responsible for all credit risks with respect to, and for collecting payment for, all products (including Goods) sold to its customers or other third parties, whether or not Buyer has made full payment to Seller for such products. The inability of Buyer to collect the purchase price for any product shall not affect Buyer's obligation to pay Seller for any Goods.

7.3    Buyer Labeling and Packaging. Buyer shall be solely responsible for the design and content of all Buyer Labeling and Packaging and shall specify such Buyer Labeling and Packaging to be applied to Goods as set forth on **Schedule 1.** Seller shall procure, at its cost, all Buyer Labeling and Packaging so specified. In the event that Buyer Labeling and Packaging changes, Buyer shall provide written notice to Seller specifying the changes and the effective date of such changes, and reimburse Seller for its costs obtaining any obsolete Buyer Labeling and Packaging and Buyer shall further reimburse Seller for any increase in price for new Buyer Labeling and Packaging.

8.    Compliance with Laws. Buyer and Seller shall at all times comply with all Laws applicable to this Agreement, Buyer's performance of its obligations hereunder and Buyer's use or sale of the Goods. Without limiting the generality of the foregoing, Buyer shall (a) at its own expense, maintain all certifications, credentials, licenses and permits necessary to conduct its business relating to the purchase, use or resale of the Goods; (b) not engage in any activity or transaction involving the Goods, by way of resale, lease, shipment, use or otherwise, that violates any Law. The laws governing the Goods differ among the various states, and as a result, it may be illegal to take or transfer the Goods across state or international borders. Buyer represents that it is aware of the Laws applicable to it governing the possession, use, transport, or sale, of the Goods.

9.    Representations and Warranties.

9.1    Buyer's Representations and Warranties. Buyer represents and warrants to Seller that:

(a)    it is a Delaware LLC duly organized, validly existing and in good standing under the laws of Delaware;

(b)    it is duly qualified to do business and is in good standing in every jurisdiction in which such qualification is required;

(c)    it has the full right, power and authority to enter into this Agreement and to perform its obligations hereunder;

(d)    the execution of this Agreement by its authorized Representative whose signature is set forth at the end of this Agreement, and the delivery of this Agreement by Buyer, have been duly authorized by all necessary action on the part of Buyer;

(e)    the execution, delivery and performance of this Agreement by Buyer will not violate, conflict with, require consent under or result in any breach or default under (i) any of Buyer's organizational documents (including its Articles of Organization and Operating Agreement) (ii) any applicable Law, or (iii) with or without notice or lapse of time or both, the provisions of any contract to which Buyer is a party or to which Buyer's assets are subject;

(f)    this Agreement has been executed and delivered by Buyer and (assuming due authorization, execution and delivery by Seller) constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws

11

and equitable principles related to or affecting creditors' rights generally or the effect of general principles of equity;

    (g)    it is in compliance with all applicable Laws and contracts to which Buyer is a party or to which Buyer's assets are subject relating to this Agreement, the Goods and the operation of its business;

    (h)    it has obtained all licenses, authorizations, approvals, consents or permits required by applicable Laws to conduct its business generally and to perform its obligations under this Agreement;

    (i)    it is not insolvent and is paying all of its debts as they become due; and

    (j)    all financial information that it has provided to Seller is true and accurate and fairly represents Buyer's financial condition.

9.2    <u>Seller's Representations and Warranties.</u> Seller represents and warrants to Buyer that:

    (a)    it will manufacture the Goods in accordance with Good Manufacturing Practices regulations promulged by the U.S. Food and Drug Administration; and

    (b)    it will promptly notify Buyer of any delay or defect in the production of the Goods; and

    (c)    it is a Tennessee LLC duly organized, validly existing and in good standing under the laws of Tennessee.

9.3    <u>Disclaimer of Warranty.</u>

**BUYER ACKNOWLEDGES THAT THE SERVICES RENDERED AND GOODS PROVIDED HEREUNDER, AND ANY DERIVATIVES THEREFROM, ARE PROVIDED "AS IS," "WITH ALL FAULTS" AND WITHOUT ANY WARRANTIES OF ANY KIND, WHETHER EXPRESS, STATUTORY OR IMPLIED EXCEPT AS OTHERWISE PROVIDED HEREIN. SELLER MAKES NO REPRESENTATIONS OR WARRANTIES REGARDING USE OF THE GOODS FOR ANY PURPOSES, INCLUDING BUYER'S FURTHER DISTRIBUTION, PROCESSING, AND SALE OF THE GOODS AND INCLUDING USE OF THE PRODUCT IN APPLICATIONS INVOLVING THE DIAGNOSIS, CURE, MITIGATION, TREATMENT OR PREVENTION OF DISEASE.**

**SELLER HEREBY DISCLAIMS, AND BUYER WAIVES, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY AND ALL WARRANTIES WHATSOEVER, EITHER ORAL OR WRITTEN, INCLUDING ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, OR NON-INFRINGEMENT, WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED, AND BUYER ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY SELLER, OR ANY OTHER PERSON ON SELLER'S BEHALF.**

9.4    <u>Withdrawal of Goods.</u> If Seller determines that any Goods sold to Buyer may be Nonconforming Goods, at Seller's request, Buyer shall withdraw all similar Goods from sale and, at

Seller's option, either return such Goods to Seller (pursuant to the terms of this Section 9.4) or destroy the Goods and provide Seller with written certification of such destruction. Notwithstanding the limitations of Section 4.4, if Buyer returns all withdrawn Goods or destroys all withdrawn Goods and provides Seller with written certification of such destruction within 30 days following Seller's withdrawal request, in either case consistent with Seller's instructions, unless any such defect has not been caused or contributed to by any abuse, misuse, neglect, negligence, accident, improper testing, improper storage or improper handling by Buyer, Seller shall (a) repair or replace all such returned Goods or (b) replace such destroyed Goods, in either case pursuant to the terms of Section 4.4. THIS SECTION 9.4 SETS FORTH BUYER'S SOLE REMEDY AND SELLER'S ENTIRE LIABILITY FOR ANY GOODS THAT ARE WITHDRAWN PURSUANT TO THIS SECTION 9.4.

10.   Indemnification.

10.1   Buyer Indemnification. Subject to the terms and conditions of this Agreement, including those set forth in Section 10.3, Buyer (as "*Buyer Indemnifying Party*") shall indemnify, defend and hold harmless Seller and its Representatives/officers, directors, employees, equity holders, agents, Affiliates, successors and permitted assigns (collectively, "*Seller Indemnified Party*") against any and all losses, damages, liabilities, deficiencies, claims, actions, causes of action, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including attorneys' fees, fees and the costs of enforcing any right to indemnification under this Agreement and the cost of pursuing any insurance providers, incurred by Indemnified Party (collectively, "*Losses*"), relating to or arising out of any Claim alleging:

(a)   a breach or non-fulfillment of any representation, warranty, or agreement set forth in this Agreement by Buyer Indemnifying Party or Buyer Indemnifying Party's Personnel;

(b)   Buyer Labeling and Packaging infringes upon the Intellectually Property rights of a third-party or otherwise violates any applicable Law;

(c)   any negligent or more culpable act or omission of Buyer Indemnifying Party, its Affiliates, or its Personnel in connection with the use, marketing, or sale of the Goods or any products incorporating or derived therefrom;

(d)   any bodily injury, death of any Person or damage to real or tangible personal property caused by a Buyer Indemnifying Party's or its Personnel's use or sale of the Goods or any product incorporating or derived from the Goods; or

(e)   any failure by Buyer Indemnifying Party or its Personnel to comply with any applicable Laws.

10.2   Seller Indemnification. Subject to the terms and conditions of this Agreement, including those set forth in Section 10.3. Seller (as "*Seller Indemnifying Party*") shall indemnify, defend and hold harmless Buyer and its Representatives/officers, directors, employees, equity holders, agents, Affiliates, successors and permitted assigns (collectively, "*Buyer Indemnified Party*") against any and all Losses, relating to or arising out of any Claim alleging:

(a)   a breach or non-fulfillment of any representation, warranty, or agreement set forth in this Agreement by Seller Indemnifying Party or Seller Indemnifying Party's Personnel; or

13

(b)      any failure by Seller Indemnifying Party or its Personnel to comply with any applicable Laws.

10.3    Exceptions and Limitations on Indemnification. Notwithstanding anything to the contrary in this Agreement, an Indemnifying Party is not obligated to indemnify or defend (if applicable) an Indemnified Party against any Claim to the extent such Claim or corresponding Losses arise out of or result from the Indemnified Party's or its Personnel's:

(a)      gross negligence or more culpable act or omission (including recklessness or willful misconduct); or

(b)      bad faith failure to comply with any of its obligations set forth in this Agreement.

10.4    Insurance.

(a)      Buyer shall maintain and provide the Seller a certificate in insurance indicating the Seller is an "Additional Insured", at its own expense, in full force and effect at all times during the Term and if written on a "claims made" basis, for a period of six years thereafter, the following insurance coverage (the "*Required Policies*"):

(i)      a Commercial General Product Liability insurance policy including personal and advertising injury, products/completed operations, products liability, medical payments, bodily injury, and property damage providing at least Ten Million United States Dollars (US $10,000,000)] of coverage; and

(ii)     Umbrella/Excess Liability Insurance coverage with limits of no less than $3,000,000 per occurrence; and

(b)      a Product Recall insurance policy covering transportation costs, communication costs, testing and sorting expenses, product disposal costs, storage/replacement/repair costs, overtime. All coverages required hereunder shall be carried with insurer(s) having a minimum Best Rating of A (IX) and otherwise reasonably acceptable to Seller. The Required Policies must be written on either an occurrence basis or on a claims-made basis and shall name Seller as an additional named insured as its interests appear herein. The Required Policies shall provide for at least thirty (30) days' prior written notice to Seller of the cancellation or any substantial modification thereof (including, without limitation, any reduction of the aggregate limit of coverage). All rights of subrogation against Seller under such insurance coverage are hereby waived by Buyer. Buyer hereby agrees and confirms that the coverage obtained by Buyer hereunder shall apply as primary to any insurance coverage obtained by Seller. If Buyer cancels or substantially modifies the Required Policies or fails to keep the Required Policies in full force and effect, Seller shall have the right, at any time thereafter, without prejudice to its other rights, to terminate this Agreement effective immediately upon notice to Buyer of such termination. Seller shall review annually these insurance requirements and, if Seller, in its good faith business judgment based upon past claims history of Buyer, dollar volume of Seller's sales of Goods or current market conditions, believes that such requirements do not adequately protect Seller, Seller shall have the right to require that Buyer increase its insurance coverage to levels which Seller, in exercising such judgment, believes will adequately protect Seller. In addition, Seller shall have the right, but not the obligation, to purchase such additional coverage and to be reimbursed by Buyer for all costs related thereto. Upon execution of this Agreement, and as Seller may request from time to time,

14

Buyer shall provide Seller with certificates of insurance or copy of the policies evidencing the coverage outlined herein. Renewal certificates for such policies shall be issued at least ten (10) days prior to the policy expiration. All certificates and notices regarding insurance shall be provided to Tod Shuttleworth at tod@vcmcbd.com or such other officer later designated by Seller.

(c)    In case of Buyer's failure to maintain the Required Insurance policies listed in this Section 10.4, Seller may, at its option, immediately terminate the Agreement, or procure the aforementioned insurance and charge Buyer for the amount so expended by Seller.

11.    <u>Limitation of Liability</u>.

11.1    <u>NO LIABILITY FOR CONSEQUENTIAL OR INDIRECT DAMAGES</u>. IN NO EVENT SHALL SELLER OR ITS REPRESENTATIVES BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS AGREEMENT, REGARDLESS OF (A) WHETHER SUCH DAMAGES WERE FORESEEABLE, (B) WHETHER OR NOT SELLER WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR (C) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.

11.2    <u>ASSUMPTION OF RISK</u>. THE GOODS ARE NOT MANUFACTURED OR INTENDED FOR USE IN ANY PHARMACEUTICAL PRODUCT. THE US FOOD AND DRUG ADMINISTRATION HAS NOT DESIGNATED THE GOODS AS GENERALLY RECOGNIZED AS SAFE AND THEREFORE THE GOODS MAY NOT BE SAFE FOR HUMAN USE OR CONSUMPTION. BUYER ASSUMES ALL RISK AND LIABILITY FOR THE RESULTS OBTAINED BY THE USE OR SALE OF ANY GOODS IN THE PRACTICE OF ANY PROCESS, WHETHER IN TERMS OF OPERATING COSTS, GENERAL EFFECTIVENESS, PRODUCT SAFETY, SUCCESS OR FAILURE, AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY SELLER, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE GOODS.

11.3    <u>LIMITATION OF LIABILITY. SELLER'S TOTAL LIABILITY UNDER THIS AGREEMENT FOR ANY REASON, WHETHER IN CONTRACT, TORT, OR OTHERWISE, WILL NOT EXCEED THE AGGREGATE AMOUNT PAID BY BUYER FOR THE APPLICABLE GOODS.</u>

12.    <u>Intellectual Property Rights</u>.

12.1    <u>Ownership</u>. The Parties acknowledge and agree that:

(a)    Seller will retain its Intellectual Property Rights used to manufacture the Goods and any of their component parts (other than Seller's proprietary formulations);

(b)    Buyer will retain its Intellectual Property Right in all proprietary formulations provided by Seller for the manufacture of certain Goods;

(c)    Neither Buyer nor Seller shall acquire any ownership interest in the other Party's Intellectual Property Rights or the Confidential Information under this Agreement; and

15

(d)   Both Parties shall only use the other's Intellectual Property Rights to the extent authorized in this Agreement.

12.2   Prohibited Acts. Neither Party shall:

(a)   take any action that may interfere with the other Party's rights in or to such Party's Intellectual Property Rights, including Seller's ownership of custom formulations for Goods provided to Buyer hereunder;

(b)   challenge any right, title or interest of the other Party's Intellectual Property Rights;

(c)   make any claim or take any action adverse to the other Party's ownership of its Intellectual Property Rights;

(d)   register or apply for registrations, anywhere in the world, for the other Party's Trademarks or any other Trademark that is similar to the other Party's Trademarks or that incorporates the other Party's Trademarks in whole or in confusingly similar part; or

(e)   use any mark, anywhere, that is confusingly similar to the other Party's Trademarks.

12.3   License to Buyer Labeling and Packaging. Buyer hereby grants to Seller a non-exclusive license to the Intellectual Property Rights contained in any Buyer Labeling and Packaging or any propriety Goods to the extent necessary for Buyer to manufacture and deliver the Goods as directed under this Agreement.

13.   Confidentiality.

13.1   Scope of Confidential Information. From time to time during the Term, either Party (as the "**Disclosing Party**") may disclose or make available to the other Party (as the "*Receiving Party*") information about its business affairs, goods and services, the terms of this Agreement, Forecasts, confidential information and materials comprising or relating to Intellectual Property Rights, trade secrets, third-party confidential information and other sensitive or proprietary information. Such information, whether orally or in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential," is collectively referred to as "*Confidential Information*" hereunder. Notwithstanding the foregoing, Confidential Information does not include information that, at the time of disclosure and as established by documentary evidence:

(a)   is or becomes generally available to and known by the public other than as a result of, directly or indirectly, any breach of this Section 13 by the Receiving Party or any of its Representatives;

(b)   is or becomes available to the Receiving Party on a non-confidential basis from a third-party source, provided that such third party is not and was not prohibited from disclosing such Confidential Information;

(c)   was known by or in the possession of the Receiving Party or its Representatives prior to being disclosed by or on behalf of the Disclosing Party;

16

(d)     was or is independently developed by the Receiving Party without reference to or use of, in whole or in part, any of the Disclosing Party's Confidential Information; or

13.2   Protection of Confidential Information. The Receiving Party shall:

(a)     protect and safeguard the confidentiality of the Disclosing Party's Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care;

(b)     not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than to exercise its rights or perform its obligations under this Agreement; and

(c)     not disclose any such Confidential Information to any Person, except to the Receiving Party's Representatives who need to know the Confidential Information to assist the Receiving Party, or act on its behalf, to exercise its rights or perform its obligations under this Agreement.

The Receiving Party shall be responsible for any breach of this Section 13 caused by any of its Representatives. On the expiration or earlier termination of this Agreement, the Receiving Party and its Representatives shall promptly return all Confidential Information and copies thereof that it has received under this Agreement.

14.   Tooling. All Tooling used to manufacture the Goods is owned by Seller ("*Seller Tooling*"). Buyer has no right, title, or interest in or to any of the Seller Tooling.

15.   Miscellaneous.

15.1   Further Assurances. Upon a Party's reasonable request, the other Party shall, at its sole cost and expense, execute and deliver all such further documents and instruments, and take all such further acts, necessary to give full effect to this Agreement.

15.2   Relationship of the Parties. The relationship between Seller and Buyer is solely that of vendor and vendee, and they are independent contracting parties. Nothing in this Agreement creates any agency, joint venture, partnership or other form of joint enterprise, employment or fiduciary relationship between the Parties. Neither Party has any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party or to bind the other Party to any contract, agreement or undertaking with any third party.

15.3   Entire Agreement. This Agreement, including and together with the Basic Purchase Order Terms and any related exhibits and schedules, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

15.4   Survival; Statute of Limitations. Notwithstanding anything herein to the contrary, in addition to any section that may survive pursuant to the terms therein, Sections 9, 10, 12, and 13, as well as any other Sections that expressly or impliedly survive expiration or termination, shall survive the expiration or termination of this Agreement.

17

15.5    Notices. All notices, requests, consents, claims, demands, waivers and other communications under this Agreement (each, a "*Notice*") must be in writing and addressed to the other Party at its address set forth below (or to such other address that the receiving Party may designate from time to time in accordance with this section). All Notices must be delivered by personal delivery, nationally recognized overnight courier or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) on receipt by the receiving Party, and (b) if the Party giving the Notice has complied with the requirements of this Section.

Notice to Seller:

178 Clifftop Drive

Hendersonville, TN 37075

E-mail: tod@vcmcbd.com, will@vcmcbd.com

Attention: Tod Shuttleworth, Will Brownlow

Notice to Buyer:

6710 N Scottsdale Rd Suite 240

Scottsdale, AZ 85253

E-mail: brianmeadows@purekana.com

Attention: Brian Meadows

15.6    Interpretation. For purposes of this Agreement: (a) the words "include," "includes" and "including" are deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole; (d) words denoting the singular have a comparable meaning when used in the plural, and vice-versa; and (e) words denoting any gender include all genders. Unless the context otherwise requires, references in this Agreement: (x) to sections, exhibits, schedules, attachments and appendices mean the sections of, and exhibits, schedules, attachments and appendices attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. The Parties drafted this Agreement without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted. The exhibits, schedules, attachments and appendices referred to herein are an integral part of this Agreement to the same extent as if they were set forth verbatim herein.

15.7    Headings. The headings in this Agreement are for reference only and do not affect the interpretation of this Agreement.

15.8    Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability does not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or provision is invalid, illegal or

18

unenforceable, the court may modify this Agreement to affect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

15.9   Amendment and Modification. No amendment to this Agreement is effective unless it is in writing, identified as an amendment to this Agreement and signed by an authorized Representative of each Party.

15.10   Waiver.

(a)   No waiver under this Agreement is effective unless it is in writing, identified as a waiver to this Agreement and signed by an authorized Representative of the Party waiving its right.

(b)   Any waiver authorized on one occasion is effective only in that instance and only for the purpose stated and does not operate as a waiver on any future occasion.

(c)   None of the following constitutes a waiver or estoppel of any right, remedy, power, privilege or condition arising from this Agreement:

(i)   any failure or delay in exercising any right, remedy, power or privilege or in enforcing any condition under this Agreement; or

(ii)   any act, omission or course of dealing between the Parties.

15.11   Cumulative Remedies. All rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the Parties or otherwise. Notwithstanding the previous sentence, the Parties intend that Buyer's rights under Section 4.2, Section 4.4, and Section 9.4 are Buyer's exclusive remedies for the events specified therein.

15.12   Equitable Remedies. Each Party acknowledges and agrees that (a) a breach or threatened breach by the Disclosing Party of any of its obligations under Section 13 would give rise to irreparable harm to the Receiving Party for which monetary damages would not be an adequate remedy and (b) in the event of a breach or a threatened breach by the Receiving Party of any such obligations, Disclosing Party shall, in addition to any and all other rights and remedies that may be available to Disclosing Party at law, at equity or otherwise in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction, without any requirement to post a bond or other security, and without any requirement to prove actual damages or that monetary damages will not afford an adequate remedy. Both parties agree that such party will not oppose or otherwise challenge the appropriateness of equitable relief or the entry by a court of competent jurisdiction of an order granting equitable relief, in either case, consistent with the terms of this Section 15.12.

15.13   Assignment. Neither Party may not assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Party. Any purported assignment or delegation in violation of this Section is null and void. No assignment or delegation relieves Buyer of any of its obligations under this Agreement.

19

15.14   Successors and Assigns. This Agreement is binding on and inures to the benefit of the Parties and their respective permitted successors and permitted assigns.

15.15   No Third-Party Beneficiaries. This Agreement benefits solely the Parties to this Agreement and their respective permitted successors and permitted assigns and nothing in this Agreement, express or implied, confers on any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

15.16   Dispute Resolution. Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or invalidity hereof (each, a *"Dispute"*), shall be submitted for negotiation and resolution to the CEO of Seller (or to such other person of equivalent or superior position designated by Seller in a written Notice to Buyer) and the CEO of Buyer (or to such other person of equivalent or superior position designated by Buyer in a written Notice to Seller), by delivery of written Notice (each, a *"Dispute Notice"*) from either of the Parties to the other Party. Such persons shall negotiate in good faith to resolve the Dispute. If the Parties are unable to resolve any Dispute within thirty (30) days after delivery of the applicable Dispute Notice, either Party may file suit in a court of competent jurisdiction in accordance with the provisions of Section 15.18 hereunder. If a dispute arises regarding this Agreement, then the prevailing Party will be entitled to its reasonable attorney's fees and expenses incurred in addition to any other relief to which it is entitled.

15.17   Governing Law. This Agreement, including all exhibits, schedules, attachments and appendices attached hereto and thereto, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the Laws of the State of Tennessee without regard to the conflict of laws provisions thereof.

15.18   Choice of Forum. Each Party irrevocably and unconditionally agrees that it shall not commence any action, litigation or proceeding of any kind whatsoever against the other Party in any way arising from or relating to this Agreement, including all exhibits, schedules, attachments and appendices attached hereto and thereto, and all contemplated transactions, including contract, equity, tort, fraud and statutory claims, in any forum other than the United States District Court for the District of Tennessee or, the courts of the State of Tennessee sitting in Nashville, Tennessee, and any appellate court from any thereof. Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation or proceeding only in the United States District Court for the District of Tennessee or, the courts of the State of Tennessee sitting in Nashville, Tennessee. Each Party agrees that a final judgment in any such action, litigation or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

15.19   Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

15.20   Force Majeure. Seller shall not be liable or responsible to Buyer, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, to the extent such failure or delay is caused by or results from acts beyond Seller's control, including: (a) acts of nature; (b) flood, fire, pandemic, earthquake or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest; (d) requirements of Law; (e) actions, embargoes or blockades in effect on or after the date of this Agreement; (f) action by any Governmental Authority (whether or not having the effect of Law); (g) national or regional emergency; (h) strikes, labor stoppages or slowdowns or other industrial disturbances; (i) shortages of or delays in receiving raw materials; or (j) shortage of adequate power or transportation facilities (each, a *"Force Majeure Event"*).

20

15.21   <u>Use of Name and Logo for Marketing Purposes</u>. Buyer hereby authorizes and grants to Seller the right to use Buyer's name and logo on Seller's marketing materials, including, without limitation, Seller's website, for the purpose of listing Buyer as a representative client of Seller. This does not allow the use of Buyer's clients name, logo or websites.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first set forth above.

**PUREKANA LLC**

By: _____

Name: __Brian Meadows__

Title: __CFO__

**VCM LLC**

By: _____

Name: Will Brownlow

Title: Member

22

## SCHEDULE 1

## GOODS

| Product | Flavor | CBD Potency (per bottle) | Bottle Size | SKU Minimum Order Quantity | Lead Time | Sales Price ($/unit) | Individual Box |
|---------|--------|--------------------------|-------------|----------------------------|-----------|----------------------|----------------|
| Tincture | Citrus | 300 | 30ml | 500 | 4 weeks | 4.90 | Y |
| Tincture | Citrus | 600 | 30ml | 500 | 4 weeks | 7.21 | Y |
| Tincture | Citrus | 1000 | 30ml | 500 | 4 weeks | 9.94 | Y |
| Tincture | Fruity Pebbz | 300 | 30ml | 500 | 4 weeks | 4.90 | Y |
| Tincture | Fruity Pebbz | 600 | 30ml | 500 | 4 weeks | 7.21 | Y |
| Tincture | Fruity Pebbz | 1000 | 30ml | 500 | 4 weeks | 11.92 | Y |
| Tincture | Mint | 300 | 30ml | 500 | 4 weeks | 4.90 | Y |
| Tincture | Mint | 600 | 30ml | 500 | 4 weeks | 7.21 | Y |
| Tincture | Mint | 1000 | 30ml | 500 | 4 weeks | 11.92 | Y |
| Tincture | Vanilla | 300 | 30ml | 500 | 4 weeks | 4.90 | Y |
| Tincture | Vanilla | 600 | 30ml | 500 | 4 weeks | 7.21 | Y |
| Tincture | Vanilla | 1000 | 30ml | 500 | 4 weeks | 9.94 | Y |
| Tincture | Unflavored | 300 | 30ml | 500 | 4 weeks | 4.90 | Y |
| Tincture | Unflavored | 600 | 30ml | 500 | 4 weeks | 7.21 | Y |
| Tincture | Unflavored | 1000 | 30ml | 500 | 4 weeks | 11.92 | Y |
| Tincture | Unflavored | 2500 | 60ml | 500 | 4 weeks | 25.72 | Y |
| Tincture | Unflavored | 5000 | 60ml | 500 | 4 weeks | 51.88 | Y |
| Capsule | 25mg/softgel | 750 | 30 count | 500 | 4 weeks | 11.09 | Y |
| Topical | Cooling Lotion | 600 | 100ml | 500 | 4 weeks | 10.31 | N |
| Topical | Cooling Lotion | 1500 | 100ml | 500 | 4 weeks | 12.09 | N |
| Topical | Cooling Roll-On | 600 | 3oz | 500 | 4 weeks | 10.41 | N |

NOTES:

PRICE IS FOB MONTICELLO, IL (SHIPPING IS ADDITIONAL)

PRICE INCLUDES BOTTLE, LABEL, BOX AND ALL INGREDIENTS

PRICING IS GOOD FOR 6 MONTHS

## EXHIBIT A

### SPECIFICATIONS

| Goods | Specifications | Buyer Labeling |
|-------|----------------|----------------|
|       |                |                |
|       |                |                |
|       |                |                |
|       |                |                |
|       |                |                |

**[EXHIBIT [B/C/D]]**

**[USE FOR ADDITIONAL SPECIFICATIONS]**

# VCM

## PUREKANA ORDER LOG

| Customer | PO # | | | Date | CUSTOMER Amount | Balance |
|---|---|---|---|---|---|---|
| | | | | | | |
| Purekana | 3506 | | | 7/7/2021 | $ 20,820.80 | |
| | | | | | $ (10,400.00) | |
| | | | | 9/5/2021 | $ 817.00 | |
| | | | | 9/15/2021 | $ (11,237.80) | $ - |
| | | | | | | |
| Purekana | 3805 | | | | $ 12,841.76 | |
| | | | | 8/13/2021 | $ (6,640.00) | |
| | | | | | $ 405.00 | |
| | | | | 10/26/2021 | $ (6,606.76) | $ - |
| | | | | | | |
| Purekana | 3897 | | | 8/26/2021 | $ 40,043.65 | |
| | | | | 8/26/2021 | $ (20,863.50) | |
| | | | | 9/28/2021 | $ 1,486.63 | |
| | | | | 10/7/2021 | $ (20,666.78) | $ - |
| | | | | | | |
| Purekana | 3957 | | | 9/7/2021 | $ 47,938.08 | |
| | | | | 9/9/2021 | $ (22,901.25) | |
| | | | 1/24/2022 | 2/4/2022 | $ (26,418.79) | |
| | | | | | $ 263.00 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | $ 591.00 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | $ 433.96 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | $ 94.00 | |
| | | | | 1/24/2021 | | $ 0.00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| Purekana | 4092 | | | 10/21/2021 | $ 80,716.96 | |

Ex 12

## VCM
## PUREKANA ORDER LOG

| | | | | | |
|---|---|---|---|---|---|
| | | | | $ (32,190.00) | |
| | | | frt | $ 1,048.00 | |
| | | | 1/1/2022 | | $ 49,574.96 |
| | | | | | |
| | | | 1/6/2022 | $ (52,428.96) | |
| | | | | | |
| | | | frt | $ 1,631.00 | |
| | | | | | $ (50,797.96) |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | frt | $ 1,223.00 | |
| | | | | | $ 1,223.00 |

| | | | | | |
|---|---|---|---|---|---|
| Purekana | 4094 | | | $ 22,633.81 | |
| | | | 11/12/2021 | $ (11,412.50) | |
| | | | frt | $ 636.93 | |
| | | 2/2/2022 | 2/18/2022 | $ (11,858.24) | $ - |
| | | | | $ 1,335.95 | |
| | | | frt | $ 34.00 | |
| | | | 2/25/2022 | $ (1,369.95) | $ - |

| | | | | | |
|---|---|---|---|---|---|
| Purekana | 4095 | | 11/24/2021 | $ 13,067.52 | |
| | | | 11/30/2021 | $ (6,640.00) | |
| | | | frt | $ 811.00 | |
| | | | 1/20/2022 | $ (7,238.52) | $ - |

| | | | | | |
|---|---|---|---|---|---|
| PureKana | | | 12/19/2021 | $ 54,002.60 | |
| | | | 12/14/2021 | $ (24,476.25) | |
| | | | frt | $ - | |
| | | | 2/18/2022 | $ (31,714.28) | $ (2,187.93) |
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| PureKana | LN-003 | | 2/3/2022 | $ 85,877.78 | |
| | | | 2/10/2022 | $ (32,832.00) | |
| | | | 2/18/2022 | $ (9,700.00) | |
| | | | frt | $ - | |
| | | | 4/6/2022 | $ (57,360.48) | |
| | | | LN-0007 | $ 10,190.00 | |
| | | | | | |
| | | | | | |
| | | | | $ (240.00) | |
| | | | | | $ (4,064.70) |

| | | | | | |
|---|---|---|---|---|---|
| PureKana | LN-003-2 | | 3/8/2022 | | |
| | | | 2/18/2022 | | |

# VCM
## PUREKANA ORDER LOG

| | | | | | |
|---|---|---|---|---|---|
| | | | frt | | |
| | | 3/9/2022 | | | $ - |
| | | | | | |
| PureKana | LN-0006 | | 3/8/2022 | $ 24,259.00 | |
| | | | 3/9/2022 | $ (12,129.50) | |
| | | | frt | $ 835.50 | |
| | | | 5/17/2022 | $ (12,965.00) | $ - |
| | | | | | |
| PureKana | LN-0007 | | 3/22/2022 | $ 42,511.80 | |
| 3/21/2022 | | | 3/23/2022 | $ (20,662.50) | |
| | | | frt | $ 2,149.00 | |
| | | | LN-003 | $ (10,190.00) | |
| | | tinctures | 5/4/2022 | $ (13,808.30) | $ - |
| | | | | | |
| PureKana | LN-0012 | | | $ 58,898.48 | |
| | | | 5/31/2022 | $ (28,132.25) | |
| | | | | $ 955.00 | |
| | | | 7/28/2022 | $ (33,111.23) | $ (1,390.00) |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | frt | $ 1,290.00 | |
| | | | | | $ 1,290.00 |
| | | | | | |
| | | | | | |
| | | | frt | $ 100.00 | |
| | | | | | $ 100.00 |
| | | | | | |
| PureKana | LN-0013 | | | $ 30,989.44 | |
| | | | 6/13/2022 | $ (14,964.00) | |
| | | | frt | $ 1,524.63 | |
| | | | 9/12/2022 | $ (17,550.07) | $ - |
| | | | | | |
| PureKana | LN-0016 | | 8/11/2022 | $ 19,621.20 | |
| | | | INCENTIVE | $ (5,000.00) | |
| | | | frt | $ 1,022.00 | |
| | | 9/12/2022 | 9/19/2022 | $ (15,643.20) | $ - |
| | | | | | |
| PureKana | LN-0019 | 11/10/2022 | 10/3/2022 | $ 18,894.90 | |
| | | | 10/17/2022 | $ (9,087.50) | |
| | | | frt | $ 1,012.00 | |
| | | 11/15/2022 | 11/10/2022 | $ (10,819.40) | $ - |
| | | | | | |
| PureKana | LN-0020 | | 10/3/2022 | $ 7,364.00 | |
| | | | 10/17/2022 | $ (3,682.00) | |
| | | | frt | $ 157.50 | |
| | | 11/15/2022 | 11/12/2022 | $ (3,839.50) | $ - |

# VCM
## PUREKANA ORDER LOG

| | | | | | | |
|---|---|---|---|---|---|---|
| PureKana | LN-0021 | | | 10/21/2022 | $ 20,193.40 | |
| | | | | | $ (9,505.50) | |
| | | | frt | | $ 712.00 | |
| | | | 12/2/2022 | 11/23/2022 | $ (11,399.90) | $ - |
| | | | | 10/21/2022 | $ 3,664.00 | |
| | | | | | $ (1,832.00) | |
| | | | frt | | $ 144.00 | |
| | | | | 12/2/2022 | $ (1,976.00) | $ - |

| | | | | | | |
|---|---|---|---|---|---|---|
| PureKana | LN-0022 | | | 11/2/2022 | $ 13,740.00 | |
| | | | | 11/3/2022 | $ (6,870.00) | |
| | | | frt | | $ 833.89 | |
| | | | 1/18/2023 | 1/16/2023 | $ (7,703.89) | |
| | | | | | | |
| | | | | 1/5/2023 | | $ - |
| | RI #022 | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| PureKana | LN-0024 | | | 11/2/2022 | $ 5,260.00 | |
| | | | | 11/3/2022 | $ (2,630.00) | |
| | | | | | $ 430.00 | |
| | | | | 12/14/2022 | $ (3,060.00) | $ - |

| | | | | | | |
|---|---|---|---|---|---|---|
| PureKana | LN-0026 | | | 12/1/2022 | $ 34,443.52 | |
| | | | | 12/14/2022 | $ (16,314.25) | |
| | | | frt | | $ 1,141.00 | |
| | | | 1/18/2023 | 1/16/2023 | $ (8,109.41) | |
| | | | | 1/23/2023 | $ (11,160.86) | $ - |
| | | | | | $ 14,964.00 | |
| | | | | 12/14/2022 | $ (7,482.00) | |
| | | | frt | | $ 724.50 | |
| | | | | 1/23/2023 | $ (4,652.44) | |
| | | | | 1/24/2023 | $ (3,554.06) | $ - |

| | | | | | | |
|---|---|---|---|---|---|---|
| PureKana | LN-0030 | | | 1/16/2023 | $ 25,114.15 | |
| | | | | 1/24/2023 | $ (12,259.25) | |
| | | | frt | | $ 933.00 | |
| | | | 4/3/2023 | 3/8/2023 | $ (13,787.90) | $ - |

| | | | | | | |
|---|---|---|---|---|---|---|
| PureKana | LN-0031 | | | 2/3/2023 | $ 12,663.01 | |
| | | | | 2/10/2023 | $ (6,109.50) | |
| | | | frt | | $ 177.00 | |
| | | | 4/4/2023 | 3/8/2023 | $ (6,730.51) | $ - |

# VCM

## PUREKANA ORDER LOG

| PureKana | LN-0033 | 2/27/2023 | 2/16/2023 | $ 28,817.76 | |
| | | | 4/4/2023 | $ (6,109.50) | |
| | extra | | frt | $ 1,060.50 | |
| | | | 4/5/2023 | $ (9,034.71) | |
| | extra #2 | | | | |
| | | | | $ 98.70 | |
| | | | | | |
| | | | | | |
| | | | | $ 311.46 | |
| | | | 4/7/2023 | $ (15,144.21) | |
| | | | | | $ - |

| PureKana | LN-0036 | | 3/15/2023 | $ 36,181.65 | |
| | | | 3/17/2023 | $ (19,652.00) | |
| | | | | $ 93.00 | |
| | | | 6/13/2023 | $ (5,000.00) | |
| | | | 6/14/2024 | $ (5,000.00) | |
| | | | 6/15/2023 | $ (6,622.65) | |
| | | | | | $ - |

| PureKana | LN-0040 | | 3/28/2023 | $ 16,488.00 | |
| | | | 4/7/2023 | $ (8,244.00) | |
| | | | frt | $ 581.21 | |
| | | | 5/26/2023 | $ (5,000.00) | |
| | | | | | |
| | | | 6/2/2023 | $ (3,825.21) | |
| | | | | | $ - |
| | | | frt | $ 5,313.71 | |
| | | | | | |
| | RI #022 | | | | |
| | | | | | |

| PureKana | LN-0041 | | 4/5/2023 | $ 12,876.13 | |
| | | | 4/13/2022 | $ (7,812.00) | |
| | | | frt | $ 187.00 | |
| | | | | | |
| | | | 4/5/2023 | $ 16,932.00 | |
| | | | 4/10/2023 | $ (8,244.00) | |
| | | | frt | $ - | |
| | | | 6/5/2023 | $ (5,055.88) | |
| | | | 6/6/2023 | $ (5,055.88) | |
| | | | 6/7/2023 | $ (5,055.87) | |
| | | | frt | $ 1,228.50 | |
| | | | | $ - | $ (0.00) |

| PureKana | RUSH 4-17-23 | | 4/20/2023 | $ 8,689.75 | |
| | | | 5/4/2023 | $ (9,175.75) | |

# VCM
## PUREKANA ORDER LOG

| | | | | | $ 486.00 | |
| | | | | | | $ - |

| PureKana | LN-VCM3 | 6/16/2023 | 5/10/2023 | $ 9,307.36 | |
| | | | | 6/26/2023 | $ (2,812.08) | |
| | | | | frt | $ 141.00 | |
| | | | | | | |
| | | | | 8/4/2023 | $ (6,636.28) | $ - |

| PureKana | LN-0046 | | 6/7/2023 | $ 32,886.84 | |
| | | | 6/14/2023 | $ (16,026.50) | |
| | | | frt | $ 786.52 | |
| | | | 7/28/2023 | $ (17,646.86) | $ - |

| PureKana | LN-0047 | | 6/7/2023 | $ 27,677.96 | |
| | | | 6/20/2023 | $ (13,887.00) | |
| | | | | $ 1,407.00 | |
| | | | 7/17/2023 | $ (15,197.96) | $ - |

| PureKana | LN-0050 | | | $ 12,761.30 | |
| | | | 7/17/2023 | $ (6,031.25) | |
| | | | frt | $ 202.02 | |
| | | | | $ 30.00 | |
| | | 9/5/2023 | 8/28/2023 | $ (6,962.07) | $ - |

| PureKana | VCM-0001 | | 8/18/2023 | $ 16,016.00 | |
| | | | 8/31/2023 | $ (8,396.50) | |
| | | | frt | $ 777.00 | |
| | | | | | |
| | | 10/6/2023 | 9/26/2023 | $ (8,396.50) | $ - |

| PureKana | VCM-0002 | | 10/16/2023 | $ 33,701.76 | |
| | | | 10/18/2023 | $ (10,501.75) | |
| | | | | | |
| | | | 10/23/2023 | $ (10,501.75) | |
| | | | | $ 1,209.42 | |
| | | | | | |
| PureKana | | | 10/13/2023 | $ 9,976.00 | |
| | | | 12/21/2023 | $ (13,183.34) | |
| | | | 12/22/2023 | $ (13,183.34) | |
| | | | frt | $ 483.00 | |
| | | | VCM Freight | $ 2,000.00 | $ - |
| | | | | | |
| PureKana | VCM-0003 | | 11/12/2024 | $ 8,415.44 | |
| | | | 11/27/2023 | $ (6,308.00) | |

# VCM

## PUREKANA ORDER LOG

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | $ | 133.19 | |
| | | | | | | | |
| PureKana | | | | 1/12/2024 | $ | 4,580.00 | |
| | | | | | | | |
| | | | | frt | $ | 210.00 | |
| | | | | 1/25/2024 | $ | (7,030.63) | $ - |
| | | | | | | | |
| PureKana | VCM-0004 | | | 12/26/2023 | $ | 20,039.62 | |
| | | | | 1/8/2024 | $ | (9,527.75) | |
| | | | | | $ | 481.90 | |
| | | | | 2/21/2024 | $ | (1,482.00) | $ 9,511.77 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PureKana | VCM-0005 | | | | $ | 3,649.36 | |
| | | 1/31/2024 | | 1/15/2024 | $ | (4,006.00) | |
| | | | | | | | |
| | | | | | $ | 93.94 | |
| | | | | | | | |
| PureKana | | | | | $ | 4,580.00 | |
| | | | | | | | |
| | | | | | | | |
| | | | | frt | $ | 210.00 | |
| | | | | | | | $ 4,527.30 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PureKana | VCM-0006 | | | 1/22/2024 | $ | 5,827.80 | |
| | | | | 2/5/2024 | $ | (2,649.00) | |
| | | | | | $ | 70.82 | |
| | | | | | | | $ 3,249.62 |

Page 7

**Fill in this information to identify the case:**

Debtor 1 Purekana, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court  **District of New Jersey**

Case number: **24-13462**

FILED

U.S. Bankruptcy Court
District of New Jersey

5/9/2024

Jeanne Naughton, Clerk

## Official Form 410
## Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:  Identify the Claim

| | |
|---|---|
| **1. Who is the current creditor?** | VCM LLC <br><br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor  William Brownlow |
| **2. Has this claim been acquired from someone else?** | ☑ No <br> ☐ Yes. From whom? |

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

VCM LLC

Name

420 Tobacco Road
London, KY 40741-420

Contact phone _____8652505576_____

Contact email _____will@vcmcbd.com_____

Where should payments to the creditor be sent? (if different)

Name

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

| | |
|---|---|
| **4. Does this claim amend one already filed?** | ☑ No <br> ☐ Yes. Claim number on court claims registry (if known) _____  Filed on _____ <br> MM / DD / YYYY |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No <br> ☐ Yes. Who made the earlier filing? _____ |

Ex 13

**Part 2: Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| **6.Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

| | | |
|---|---|---|
| **7.How much is the claim?** | $ 43215.46 | **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

**8.What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as healthcare information.

Retail CBD products sold

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:   $ _____

Amount of the claim that is secured:   $ _____

Amount of the claim that is unsecured:   $ _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:   $ _____

Annual Interest Rate (when case was filed)   _____ %

☐ Fixed
☐ Variable

| | |
|---|---|
| **10.Is this claim based on a lease?** | ☑ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition. $ _____ |

| | |
|---|---|
| **11.Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No<br>☐ Yes. *Check all that apply:* | Amount entitled to priority |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies | $ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157 and 3571.

Check the appropriate box:

☑   I am the creditor.
☐   I am the creditor's attorney or authorized agent.
☐   I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐   I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date     5/9/2024

MM / DD / YYYY

/s/  William Brownlow

Signature

Print the name of the person who is completing and signing this claim:

| Name | William Brownlow | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Manager | | |
| Company | VCM LLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer | | |
| Address | 420 Tobacco Road | | |
| | Number  Street | | |
| | London, KY 40741 | | |
| | City  State  ZIP Code | | |
| Contact phone | 8652505576 | Email | will@vcmcbd.com |

**VCM LLC**

420 Tobacco Road
LONDON, KY 40741 US
606-878-9000
londontobaccowarehouse@gmail.com
www.vcmcbd.com

# Statement

**TO**

Brian Meadows
PureKana
6710 N Scottsdale Rd
Suite 240
Scottsdale, AZ 85253

STATEMENT NO. 1006

DATE 05/06/2024

| DATE | DESCRIPTION | AMOUNT | RECEIVED |
|---|---|---|---|
| 10/30/2020 | Invoice #1104-R | 95,712.93 | 95,712.93 |
| 12/21/2020 | Invoice #1121 | 30,093.00 | 30,093.00 |
| 01/18/2021 | Invoice #1123 | 29,612.70 | 29,612.70 |
| 02/04/2021 | Invoice #1126 | 910.52 | 910.52 |
| 02/24/2021 | Invoice #1127: PO # 2754 | 68,167.15 | 68,167.15 |
| 03/18/2021 | Invoice #1129 | 19,425.96 | 19,425.96 |
| 05/21/2021 | Invoice #3018 | 36,536.51 | 36,536.51 |
| 07/13/2021 | Invoice #3506 | 21,637.80 | 21,637.80 |
| 08/13/2021 | Invoice #3897 | 41,530.28 | 41,530.28 |
| 08/17/2021 | Invoice #3529 | 37,686.08 | 37,686.08 |
| 09/07/2021 | Invoice #3957 | 49,320.04 | 49,320.04 |
| 09/08/2021 | Invoice #3805 | 13,246.76 | 13,246.76 |
| 10/26/2021 | Invoice #4092 | 84,618.96 | 84,618.96 |
| 11/23/2021 | Invoice #4094 | 23,270.74 | 23,270.74 |
| 11/30/2021 | Invoice #4095 | 13,878.52 | 13,878.52 |
| 11/30/2021 | Invoice #12-10-21 | 56,190.53 | 56,190.53 |
| 02/06/2022 | Invoice #LN-0003 | 89,702.48 | 89,702.48 |
| 02/25/2022 | Invoice #21 | 1,369.95 | 1,369.95 |
| 03/23/2022 | Invoice #LN-0006 | 25,094.50 | 25,094.50 |
| 04/25/2022 | Invoice #LN-0007 | 44,660.80 | 44,660.80 |
| 06/04/2022 | Invoice #LN-0013 | 32,514.07 | 32,514.07 |
| 07/12/2022 | Invoice #PCKG 2022 | 20,000.00 | 0.00 |
| 07/14/2022 | Invoice #LN-0012 | 61,243.48 | 61,243.48 |
| 09/09/2022 | Invoice #LN-0016 | 20,643.20 | 20,643.20 |
| 09/12/2022 | Credit Memo #LN-0016C | -5,000.00 | -5,000.00 |
| 11/03/2022 | Invoice #LN-0022 | 14,573.89 | 14,573.89 |
| 11/08/2022 | Invoice #LN-0019 | 19,906.90 | 19,906.90 |
| 11/10/2022 | Invoice #LN-0026 | 51,273.02 | 51,273.02 |
| 11/11/2022 | Invoice #LN-0020 | 7,521.50 | 7,521.50 |

| DATE | DESCRIPTION | AMOUNT | RECEIVED |
|------|-------------|--------|----------|
| 11/16/2022 | Invoice #LN-0024 | 5,690.00 | 5,690.00 |
| 11/22/2022 | Invoice #LN-0021 | 24,713.40 | 24,713.40 |
| 03/08/2023 | Invoice #LN-0031 | 12,840.01 | 12,840.01 |
| 03/08/2023 | Invoice #LN-0030 | 26,047.15 | 26,047.15 |
| 03/15/2023 | Invoice #LN-0036 | 36,274.65 | 36,274.65 |
| 03/28/2023 | Invoice #LN-0040 | 17,069.21 | 17,069.21 |
| 03/30/2023 | Invoice #LN-0033 | 30,288.42 | 30,288.42 |
| 04/05/2023 | Invoice #LN-0041 | 31,223.63 | 31,223.63 |
| 04/24/2023 | Invoice #4/17/23 | 9,175.75 | 9,175.75 |
| 06/01/2023 | Invoice #LN-VCM3 | 9,448.36 | 9,448.36 |
| 06/07/2023 | Invoice #LN-0047 | 29,084.96 | 29,084.96 |
| 06/07/2023 | Invoice #LN-0046 | 33,673.36 | 33,673.36 |
| 07/07/2023 | Invoice #LN-0050 | 12,993.32 | 12,993.32 |
| 08/24/2023 | Invoice #PK VCM-0001 | 16,793.00 | 16,793.00 |
| 10/16/2023 | Invoice #VCM-0002 | 47,370.18 | 47,370.18 |
| 11/23/2023 | Invoice #VCM-0003 | 13,338.63 | 13,338.63 |
| 11/28/2023 | Invoice #11/25/23 | 2,962.77 | 0.00 |
| 12/26/2023 | Invoice #VCM-0004 | 20,521.52 | 9,527.75 |
| 01/10/2024 | Invoice #VCM-0005 | 8,533.30 | 4,006.00 |
| 01/22/2024 | Invoice #VCM-0006 | 5,898.62 | 2,649.00 |
| 02/29/2024 | Invoice #VCM-0007 | 2,964.00 | 1,482.00 |

TOTAL AMOUNT    TOTAL RECEIVED
$1,402,246.51        $1,359,031.05

43,215.46



TO REUSE: Mark through all previous shipping labels and barcodes.

FedEx® shipping label here.

ORIGIN ID:RKWA    (865) 250-5576
WILLIAM BROWNLOW
3064 DELLWOOD DR
KNOXVILLE, TN 37919
UNITED STATES US

SHIP DATE: 08JUN26
ACTWGT: 0.70 LB
CAD: 6570297/ROSA2710

Part # 156297-435 RRDB EXP 03/27

TO  JEANNE NAUGHTON (CLERK)
U.S BANKRUPTCY CT
402 EAST STATE STREET

TRENTON NJ 08608

(000) 000-0000                    REF:

DEPT:

FedEx
Express

E

TRK#  8728 0264 8018
0201

WED - 10 JUN 5:00P
** 2DAY **

SP TTNA

08608
NJ-US    EWR



able Env

e me.

Align bottom of peel-and-stick airbill or pouch here.